19 F.3d 1435
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Patricia WARE, Petitioner-Appellant,
v.
Joanne YUKINS, Warden, Scott Correctional Facility,
Respondent-Appellee.
 No. 93-1468.
 United States Court of Appeals, Sixth Circuit.
 Feb. 25, 1994.
 
 Before: GUY and SILER, Circuit Judges; and CHURCHILL, Senior District Judge*.
 PER CURIAM.
 
 
 1
 In 1985, petitioner, Patricia Ware, was convicted of first-degree felony murder and sentenced to life in prison without parole. After unsuccessfully appealing her conviction within the state judicial system, she filed a petition for a writ of habeas corpus in federal court arguing that she was denied effective assistance of counsel. In addition, Ware alleged that the trial court erred by: allowing the jury to consider evidence relating to a separate murder for which she had also been charged; denying her motion to change venue; and granting the prosecution's motion to forbid any mention of her co-defendant's prior criminal record. Magistrate Judge Brenneman issued a thorough and carefully-reasoned report and recommendation, which was adopted by the district court. We affirm essentially on the basis of that opinion and write briefly only for further clarification.
 
 I.
 
 2
 Sometime in October of 1984 Patricia Ware sought and received William Lewis's permission to borrow his car. Ware, who had known the 84-year old Lewis for several years would, on occasion, perform household chores and run errands for Lewis. Ware's failure to return the car at an agreed-upon time prompted Lewis to contact the local authorities. Officer James Johnson of the East Lansing Police Department took Lewis's auto theft report on October 23, 1984.
 
 
 3
 On October 25, 1984, Ware, unable to contact Lewis by telephone, decided to visit Lewis's apartment to personally return the car. Ware was accompanied by Wayne Harvey. Unknown to Ware, Johnson was also travelling to Lewis's apartment at about the same time. Johnson had been notified by another officer that Lewis's car had been spotted in a shopping center parking lot. When Johnson arrived at the Lewis apartment, he secured entry with the assistance of Lawrence Helmer, the building manager. Once inside, Johnson encountered Ware. He did not, however, see Harvey, who was in a bathroom in a different part of the apartment at the time.
 
 
 4
 Ware tried to flee, but was thwarted by Helmer when he closed the apartment door before she could escape. A struggle between Johnson and Ware ensued. Although Helmer, who was now outside the apartment, did not witness what was taking place, he did hear noises suggesting that a struggle was going on. Inside, the struggle ended suddenly when, as it appears, Harvey, after emerging from the bathroom, shot Johnson in the back of the head. As Ware would later testify: "Then I didn't feel his weight on me anymore and I just, I closed my eyes and I caught my breath and I pulled the door open and I just ran." (App. 325.)
 
 
 5
 Ware and Harvey then fled on foot.[1] The two ran down the hallway of the apartment building and out on to Hart Street where they separated for a brief period of time. In the immediate aftermath of the shooting, Ware claims that she was "scared and confused" and that she was "trying to make some sense of what was happening." (Id. at 327.) Ware met up with Harvey again at Lake Lansing Road. Ware maintains that she would not have rejoined Harvey were it not for her state of confusion and panic.
 
 
 6
 The two eventually found their way to the residence of Connie Sonnenberg. Ware provides the following account of what then transpired. An unsuspecting Sonnenberg allowed Ware and Harvey into her house. Harvey then ordered Ware to try different keys taken from Sonnenberg to see whether one would start a vehicle parked outside the house. After Ware had tried one set of keys, Harvey fatally shot Sonnenberg. Harvey then ordered Ware to take possession of the murder weapon. Ware complied with the directive allegedly because: "I was just scared. I don't know. I mean, I was, he just shot that woman and he said, here, take it and I took it." (Id. at 338.) Ware did not keep the gun for long; Harvey retrieved it after it discharged as Ware was stuffing it into her pants. Ware, however, was left with only with a superficial leg wound.
 
 
 7
 Ware's and Harvey's attempt at a getaway using a vehicle found at the Sonnenberg residence was also shortlived. Evidently, neither knew how to operate the vehicle's manual transmission. Ware and Harvey soon abandoned the car, and as they were doing so, Harvey handed Ware a purse that had been stolen from Sonnenberg. They then set out on foot, but were soon apprehended by police officers. A search of the purse revealed a revolver, which Ware claims Harvey placed in the purse without her knowledge.
 
 
 8
 Harvey and Ware were subsequently charged with one count of premeditated murder and one count of felony murder for the deaths of Johnson and Sonnenberg. After the defendants had been bound over on both charges, Ware's case was severed from that of Harvey.[2] The following inculpatory evidence was collected:
 
 
 9
 A jacket with [Harvey's] hair on it was found in the apartment bathroom. In the jacket pocket, there were .22 caliber bullets, the type used in the shootings. [Harvey's] fingerprints were found on a five-dollar bill and a package of cigarette papers that were also in the jacket pocket. Partial prints of [Harvey's] shoes were found in the bathroom of the apartment. Fingerprints were found on Lewis' car matching those of Ware and [Harvey].
 
 
 10
 Ware had a powder burn below her waist. A bullet hole was discovered in the pocket of Ware's pants. [Harvey] had lead residue on the waistband of his pants and on his underwear.
 
 
 11
 An autopsy was performed on both victims. A bullet was removed from each of their heads. Firearms expert David Townsend compared test shots with the bullets taken from the victims and concluded that they probably came from the same gun.
 
 
 12
 People v. Harvey, 423 N.W.2d 335, 338 (Mich.Ct.App.1988).
 
 
 13
 Prior to trial, Ware filed a motion for a change of venue in light of the pretrial media attention the case had already received. The court declined to rule on the motion until it had attempted to select a jury. The court ultimately denied Ware's motion, but only after a jury had been selected to the apparent satisfaction of both parties. That Ware shared in the satisfaction was, in the estimation of the court, evidenced by the fact that she still held eleven preemptory challenges in reserve as of the time jury selection was complete.[3]
 
 
 14
 Subsequently, the jury the parties had settled upon acquitted Ware of the shooting of Johnson, but convicted her for the first-degree felony murder of Sonnenberg. On February 27, 1985, Ware was sentenced to a mandatory term of life in prison without the possibility of parole. Ware, through new counsel, appealed her conviction to the Michigan Court of Appeals. Before the court rendered an opinion, however, it remanded for an evidentiary hearing on Ware's ineffective assistance of counsel claim. The trial court rejected this claim in a written opinion dated February 11, 1987.
 
 
 15
 In December of 1988, the court of appeals affirmed both Ware's conviction and sentence in an unpublished, per curium opinion. The court would later decline to grant a motion for rehearing filed by Ware. Ware then filed an application for leave to appeal to the Michigan Supreme Court. This application, too, was denied.
 
 II.
 
 16
 On March 2, 1992, Ware filed a petition for writ of habeas corpus in federal court.[4] Ware argued that her trial counsel's decision not to offer expert testimony as to her mental state at the time of the shootings in question constituted ineffective assistance of counsel. More specifically, Ware claimed that a psychological or psychiatric expert could have testified about the debilitating effect stress and fear had on her decision-making ability. As she explains: "It was the theory of the defense that Defendant Ware's actions or her failure to act between the time of the first shooting and her arrest were the result of panic (post-traumatic shock) from the shooting of Officer Johnson and of duress (fear) from Wayne Harvey's threats at the Sonnenberg house."
 
 
 17
 Ware further argued that the trial court committed three errors. First, Ware took issue with the court's decision to allow the charge implicating her in Johnson's murder to remain in the case, thus permitting the jury to consider evidence relating to that murder. Although the jury, in the end, acquitted Ware of Johnson's murder, she contends that jury consideration of this offense could have led to a compromise verdict of guilty on the Sonnenberg homicide. Next, Ware asserted that the district court committed reversible error by not granting her motion to change venue. Ware noted that the amount of media attention her case had generated compromised her right to an impartial jury. Finally, Ware contested the trial court's grant of the prosecution's motion to exclude evidence of Harvey's prior criminal record. Had such evidence been admitted, according to Ware, the jury would have more fully appreciated her fear of Harvey.
 
 
 18
 Much as the state courts before him, the magistrate saw no merit in Ware's contentions. With respect to Ware's ineffective assistance of counsel claim, the magistrate characterized the decision not to offer expert testimony as a strategic choice designed primarily to avoid the possibility of delay. Acknowledging that under Strickland v. Washington, 466 U.S. 668 (1984), such a decision is owed deference by a reviewing court, the magistrate saw no reason to disturb Ware's conviction on Sixth Amendment grounds.
 
 
 19
 The magistrate then proceeded to reject each of Ware's trial error arguments. Notwithstanding Ware's allegation that the jury returned a "compromise verdict," the magistrate concluded that sufficient evidence existed to support the charge that Ware was, if not the principal, at least an aider and abettor in Johnson's murder.[5] As to Ware's argument that her change of venue motion should have been granted, the magistrate underscored the fact that the members of the jury had been selected to the satisfaction of both parties. Of particular significance to the magistrate was Ware's failure to utilize eleven preemptory challenges. The magistrate reasoned that strong policy considerations[6] militated against the adoption of Ware's position. Lastly, the magistrate disposed of Ware's final argument--that Harvey's criminal track record should have been admitted--by reference to the general practice of federal courts in habeas corpus proceedings of not questioning state court rulings regarding the admission or exclusion of evidence.[7] See Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir.1988). Although the magistrate did recognize that federal courts may review such rulings when they result in the denial of fundamental fairness, he concluded that the present action did not fit within this exception to the general rule.
 
 
 20
 The district court adopted the report and recommendation and issued an order dismissing Ware's petition.
 
 III.
 
 21
 With regard to the magistrate's latter three determinations (all having to do with alleged trial court errors), we see no need to provide further elaboration. The magistrate's well-reasoned opinion completely and succinctly addresses the parties' assertions as well as the applicable law.
 
 
 22
 With regard to the magistrate's discussion of Ware's ineffective assistance of counsel claim, although we agree with his conclusion, we do note Ware's contention that prior courts have misunderstood the nature of her argument. Ware maintains that "there was no strategy involved in this matter." She apparently predicates this assertion on her belief that her trial counsel "never investigated and was simply unaware of the timely availability of the critical and clearly admissible psychiatric evidence he failed to present in this case." Ware's argument, however, is belied by the record. The day the trial was to commence and prior to voir dire, the following colloquy between Ware and her trial counsel took place before the court:
 
 
 23
 Q. [Defense Counsel] Miss Ware, in the last several weeks in preparing for this trial, you and I have spent considerable amounts of time together, many hours out at the jail, is that correct?
 
 
 24
 A. [Ware] Yes.
 
 
 25
 Q. And several weeks ago you and I talked about the issue of whether or not we should be calling a number of witnesses, isn't that correct?
 
 
 26
 A. Yes.
 
 
 27
 Q. You and I have heard about this great number of witnesses that the prosecutor intends to call, some 50 to 60 witnesses. And among other things we talked about shouldn't we have a bunch of witnesses because they have so many. Do you remember talking about those kinds of things?
 
 
 28
 A. Yes.
 
 
 29
 Q. And specifically we talked about the possibility of calling an expert witness, an expert in the field of psychiatry or psychology, isn't that correct?
 
 
 30
 A. Yes.
 
 
 31
 Q. And specifically, the issue that we thought perhaps we would want to call a witness to do with your reactions to certain things that were occurring around you on October 25, 1984, isn't that correct?
 
 
 32
 A. Yes.
 
 
 33
 Q. And after much discussion, you and I agreed that we would not summon such a witness or we would not attempt to get someone to testify along those lines, isn't that true?
 
 
 34
 A. That's right.
 
 
 35
 Q. And among other things, I believe we talked about the probability of doing that would result in a delay. In other words, a delay of the trial starting at this time, is that right?
 
 
 36
 A. Yes.
 
 
 37
 Q. And also, I indicated to you that if we did that, that I would have to let the prosecutor's office know that we were doing that and give them the name of this person, and that in all likelihood the prosecutor's office would then ask to have you referred to the Forensic Center so that they could have a psychiatrist or psychological expert on their side, isn't that right?
 
 
 38
 A. Yes.
 
 
 39
 Q. And in considering all of those things that we have talked about sometime ago and as recently as yesterday, you want to have the trial start today, and it is your decision not to have an expert of that kind called, isn't that true?
 
 
 40
 A. That's right.
 
 
 41
 Q. Do you have any questions of me on any of the comments about this issue that you want to tell the Court of tell me at this time?
 
 
 42
 A. No.
 
 
 43
 (Respondent's brief at 23-25; emphasis added).
 
 
 44
 We evaluate claims for ineffective assistance of counsel under the two-prong test established by the Supreme Court in Strickland, 466 U.S. at 687:
 
 
 45
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 46
 We agree with every court that has considered the argument that the decision of Ware's trial counsel not to rely on expert testimony in making Ware's post-traumatic shock/fear defense was a strategic one. Clearly, Ware's trial counsel, in consultation with Ware herself, considered the possibility of retaining an expert to testify about the effect the violent events of October 25, 1984, had on Ware's mental state and her ability to make sound decisions. Of particular significance to Ware and her counsel was the need to begin her trial promptly.[8] Although typically criminal defendants benefit from delays in their respective trials, Ware's case presented a rather unique situation. Beginning the trial without significant delays was of paramount importance to Ware and her counsel because, they feared, Harvey would, in his own trial, defend himself by blaming Ware for the murders of Johnson and Sonnenberg.[9] If they could get their case tried first, Ware and her counsel believed they could effectively pre-empt Harvey from undermining Ware's case in this fashion. Ware, as is evident from the above-quoted colloquy, was kept abreast of and concurred in this decision. We do not feel that Ware has "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 689.
 
 
 47
 Even assuming, however, that Ware satisfies the first prong of the Strickland analysis and demonstrates her trial counsel's representation to have been deficient, we are not persuaded that she can establish the requisite prejudice to prevail on her ineffective assistance of counsel claim. After all, the effect of not using an expert in this instance was not to preclude altogether testimony as to Ware's mental and emotional condition. Indeed, that Ware had lost control of her faculties in much the same manner as would a victim of "Battered Woman Syndrome" was the crux of her theory of the case--a point that defense counsel attempted to impress upon the jury on numerous occasions. What trial counsel's decision instead prevented was the introduction of a certain type of testimony, a type that would undoubtedly have been rebutted on cross-examination, or through the testimony of the opposing party's own expert. The jury obviously did not believe Ware's rendition of the events surrounding the murders of Johnson and Sonnenberg, and we are not convinced that the testimony of a defense expert would have changed matters.
 
 
 48
 For the foregoing reasons, the decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable James P. Churchill, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Later, Ware acknowledged that, since Harvey left Lewis's apartment first and the apartment's door locked automatically, she could have ensured her separation from Ware by simply staying put in the apartment. She chose to follow Harvey, she insists, not because she wanted to, but because she was panicked and confused by the events she had just witnessed
 
 
 [2]
 Ultimately, Harvey was convicted on one count of first-degree felony murder and one count of second-degree murder. He was sentenced to life imprisonment on both convictions
 
 
 [3]
 Arguing that the evidence against her was insufficient to sustain a conviction on either charge, Ware also filed a motion to quash the information. The court denied this motion as well, noting that there was, indeed, an adequate factual basis to bind over on both Counts I (open murder) and II (felony murder)
 
 
 [4]
 The March 2 petition was, in fact, the second habeas petition filed by Ware. Ware's first petition, filed in July of 1990, was dismissed by the court because one of the issues raised--regarding jury instructions--had not been properly exhausted
 
 
 [5]
 The magistrate commented "A rational juror could conclude that, during the struggle with the officer, petitioner observed Harvey approaching the officer with the gun and an implicit conspiracy was developed to kill the officer. Petitioner may have distracted the officer so that Harvey could carry out the murder." (App. 23.)
 
 
 [6]
 In the magistrate's words
 The very concept of jury selection suggests, of course, that some called for jury duty will not be acceptable. Thus, some effort must be made in every case to select an impartial jury. Normally, this can be accomplished. A defendant may not simply walk away from this task, much less claim to be satisfied, and then claim later, without more, that she was denied an impartial panel and should be given a second bite at the apple. Adopting such an easy standard would merely lead to change of venue motions being routinely filed in every case.
 (App. at 25-26.)
 
 
 [7]
 Although the jury did not learn of Harvey's record, they, of course, did know he murdered Johnson and evidently, the jury held him solely responsible for such murder since they acquitted Ware of this charge
 
 
 [8]
 Ware's general aversion to state-appointed experts examining her was another factor that influenced the decision not to call a psychological or psychiatric expert
 
 
 [9]
 As it turned out, their fear was well-founded. Harvey did, in fact, point the finger at Ware during his trial, accusing her of being the true culprit in the murders at issue